**Clinton Morse WATSON et al., Plaintiffs,**

v.

**Robert RAY et al., Defendants.**

**Civ. No. 78–106–1.**

United States District Court, S. D. Iowa, C. D.

April 29, 1981.

Paul H. Rosenberg (Rosenberg & Margulies) Des Moines, Iowa, for plaintiffs.

Thomas J. Miller, Atty. Gen. of Iowa, Des Moines, Iowa, John G. Black, Spec. Asst. Atty. Gen. of Iowa, Des Moines, Iowa, Bruce C. McDonald, Asst. Atty. Gen. of Iowa, Des Moines, Iowa, for defendants.

Patricia Gail Littlefield, Dept. of Justice, Washington, D. C., for amicus curiae.

## ORDER

STUART, Chief Judge.

The above-captioned class action was brought on behalf of all present and future general prison population inmates at the Iowa State Penitentiary, Fort Madison, Iowa, challenging the conditions of confinement at the institution. The plaintiff class in this action alleges that the totality of conditions of confinement as well as several specific conditions violate rights vested in them by the federal Constitution and laws of the State of Iowa.

The case at this time is before the Court in a unique posture. A three week trial to the Court has been conducted and the evidence has been closed. The reports of experts appointed by the Court on its own motion to examine the conditions of confinement have been filed. Following the filing of such reports, extensive settlement negotiations were entered into by counsel for the parties in this matter, and such negotiations resulted in a tentatively agreed upon proposed consent order. The proposed settlement documents were then submitted to the named representatives of the plaintiff class for their approval. Because questions and objections to the provisions of the proposal were raised by the named plaintiffs and other representatives, and since the Court believed that the difficulties might be resolved through its participation, the Court ordered and attended a final settlement conference at the penitentiary. Plaintiff class was represented at the conference by a committee of general prison population inmates which included the three named plaintiffs who were still class members, and their counsel. The defendants were represented by counsel and interested state officials. Without reviewing the settlement documents, the Court

informally gave its view of the issues it would be called upon to decide if settlement was not consummated, and its opinion of the limitations upon the remedies it could provide if constitutional violations were in fact found.

At the conclusion of the conference, the inmate committee insisted upon taking the settlement proposal to "the yard" to obtain other class members' opinions of the settlement. Additional negotiations were conducted thereafter. Ultimately, however, the inmate committee rejected the settlement proposal, and the Court took the case under advisement.

In considering the merits of the action, the Court first addressed only the issue of the totality of conditions of confinement at the penitentiary and held that such conditions did violate the plaintiff class' rights secured by the Eighth and Fourteenth Amendments. (See Appendix, Order of February 27, 1981.) The Court was then faced with the responsibility of fashioning appropriate remedies to bring the conditions within the requirements of the Constitution. To assist it in making this decision, the Court ordered the proposed settlement documents filed and gave the parties an opportunity to comment on such from an adversarial as opposed to compromising perspective. (See Appendix, Order of February 27, 1981.)

After examining the settlement proposal submitted in the form of a proposed consent order in light of the prevailing case law, the experts' reports, the evidentiary record, and the parties' comments, the Court expressed the belief that the consent order if implemented would satisfy the constitutional objections to the conditions of confinement at the penitentiary and that the best interests of the class of present and future inmates would likely be served if the settlement was consummated and approved by the Court. (See Appendix, Order of March 17, 1981.) The Court was compelled to consider the merits of the proposed consent decree by Federal Rule of Civil Procedure 23(e).

■ Federal Rule of Civil Procedure 23(e) requires the Court to act as a fiduciary preserving and guarding the right of absent class members when a settlement in a class suit is under consideration. *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir.), reh. denied en banc, cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *George v. Parry*, 77 F.R.D. 421, 424 (S.D.N.Y.), aff'd 578 F.2d 1367 (2d Cir.), cert. den., 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). A court cannot assume a passive role when the issue of settlement of a class action is before it. *Held v. Missouri Pacific Railroad Co.*, 64 F.R.D. 346, 347–48 (S.D.Tex.1974).

Because of its fiduciary obligation and its belief that the class would benefit from the acceptance of the settlement proposal, the Court notified all identifiable class members—present general prison population inmates at the penitentiary—of the settlement proposal, and solicited their comments on the provisions of the settlement offer. (See Appendix, Order of March 17, 1981.) The Court also directed plaintiff class' counsel to comment on whether the best interests of the class would be served by accepting the settlement. (See Appendix, Order of March 17, 1981.) The Court now must review the proposed consent order in light of the comments received to determine if it should, pursuant to its fiduciary obligation, accept the settlement on behalf of the class and approve its terms.

The circumstances of this case differ substantially from the usual situation involving a proposed settlement of a class action. Ordinarily, the Court is called upon to scrutinize a settlement arrived at by class representatives to determine if the settlement is fair and reasonable, in the best interest of the class, and that the interests of the absent class members are protected. Here, though the question to be determined is whether the named class representatives are acting in the best interests of the entire class, not in accepting a settlement, but in rejecting a proposed settlement.

The Court has found no cases in which a court under similar circumstances has taken it upon itself to approve a settlement on behalf of a class over the opposition of all named representatives. It clearly appears that the Court, to further the intent and purpose of Rule 23 and satisfy the direct mandate of subsection (e) to protect class members, should exercise its authority in this manner. The named plaintiffs do not have the final say as to what is in the best interest of the class. Further, a class can be as easily injured by the rejection of a favorable settlement as by the acceptance of an unfavorable settlement.

■ If the Court avoided taking these protective steps, the non-representative class members, especially the unidentifiable future general population inmates, would be left vulnerable to a decision made by the named representatives even if such decision was ill conceived or affected by circumstances outside the named representatives' control. The representative plaintiffs, however, are bound to act as a fiduciary toward the class members and may not act in such a way as to prejudice the class' interests or to further their own personal interests. *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1305 (4th Cir. 1978). Therefore, a court must have the authority to take the action contemplated herein not only to fulfill its own fiduciary obligation but also to prevent or cure the failure of the representatives to fulfill their fiduciary role.

■ The Court has completely reviewed the terms of the proposed consent order which is set out in the Appendix, the record, the comments received from members of the plaintiff class, and the law relating to conditions of confinement in prisons in light of its duty to determine if the agreement is fair, reasonable and adequate. See *Grunin*, 513 F.2d at 123. This determination is left solely to the discretion of the judge, Id., but in making this judgment, the Court may compare the terms of the compromise with the likely rewards of litigation, the adequacy of representation, the extent to which settlement has been approved by members of plaintiff class, and other relevant factors. See *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir.), reh.

denied en banc (1980); *Grunin*, 513 F.2d at 124; *Williams v. Ryan*, 78 F.R.D. 364, 368 (S.D.Ga.1978); *George*, 77 F.R.D. at 424; *McNary v. American Savings & Loan Assoc.*, 76 F.R.D. 644, 648–49 (N.D.Tex.1977); *Seiffer v. Topsy's International Inc.*, 70 F.R.D. 622, 627 (D.Kan.1976); *Green v. Wolfe Corp.*, 69 F.R.D. 568, 570 (S.D.N.Y. 1976). See also Wright & Miller, Federal Practice and Procedure, Civil § 1797 at 230 (1972); 3B Moore's Federal Practice ¶ 23.80 at 23–521 (2d ed. 1978).

█ Generally, the most important factor considered is the strength of plaintiff's case compared with the terms of the settlement offer. *Armstrong*, 616 F.2d at 314; *Grunin*, 513 F.2d at 124. In addition, even though the reaction of class members to the settlement proposal is to be taken into account, a settlement can be found to be fair even if a substantial number of members object to it. *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1215 (5th Cir.), reh. denied en banc (1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). See also *American Basketball Players Assoc. v. National Basketball Assoc.*, 72 F.R.D. 594, 598 (S.D.N.Y. 1976).

█ Therefore, in spite of the fact that all named plaintiffs and a large number of the present general prison population inmates who responded to the notice of settlement express opposition to the settlement, the Court finds pursuant to its fiduciary responsibility that the defendants' proposed consent order should be approved and accepted since it is fair, reasonable, and adequate for the following reasons:

1. The comments received from class members illustrate that the inmates are under a general misapprehension as to the Court's powers and duties under the law, the terms of the settlement and the effect of the approval of the settlement. When considering the merits of an action such as this one, this Court may only determine if any of the conditions of confinement violate the inmates' constitutional rights. It could not go any further than this even if it believed that certain changes would be wise from a prison administration standpoint.

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions.

*Procunier v. Martinez*, 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

█ In addition, the imposition of settlement in this suit in no way precludes prisoners from asserting claims against the State on other grounds or to later petition this Court for enforcement of the settlement provisions. The settlement is being incorporated in the Court decree so that the Court will have contempt power available to assure the agreement is carried out in good·faith.

2. Inmates presently confined at the penitentiary, the only identifiable class members, may have their own self-motivated interests to promote in contesting the settlement offer. Their comments must be considered with this in mind. In addition, the Court must exercise its fiduciary obligation to protect the interests of the unidentifiable future members of the class who cannot express their own opinions. The Court believes that the long term interests of the general prison population, both present and future, will be served by acceptance and approval of the settlement.

3. The Court has the distinct advantage of having fully considered the record in this matter. This has allowed it to familiarize itself with the law governing the case and to formulate preliminary conclusions as to the merits of plaintiffs' claims and the relief to which the class would be entitled. By comparing its preliminary conclusions to the terms of the proposed consent order, the Court is convinced that imposition and subsequent implementation of the settlement agreement will benefit the class far more than its decision on the merits of plaintiffs' constitutional claims. The terms of the proposed consent decree offer benefits to the inmates that could not be constitutionally imposed, and at the same time all seri-

ous constitutional issues are adequately remedied in the decree. All parties will benefit from the Court's adoption and approval of the settlement since the long needed prison reform will be effectuated pursuant to a comprehensive plan into which both the State and the prisoners have had significant input.

The Court has read each comment received from the inmates at the penitentiary in response to the settlement notice. The responses have and will be kept confidential as promised in the notice, and the Court sincerely appreciates the prisoners' efforts in presenting their opinions. The Court received comments on behalf of approximately sixty inmates out of the 502 presently residing in the general prison population. It is the Court's opinion that inmates who objected are entitled to know the reasons it has approved settlement over their expressed objections. As a result, their objections are categorized below followed by a brief discussion of each area of concern.

1. *Living conditions in the cell houses, food service area, and the prison as a whole are unsatisfactory, unsanitary, unhealthy and unsafe.*

The Court believes that the settlement adequately responds to these criticisms in a number of ways. By planning for the depopulation of the institution, the pressures created on the personnel as well as the physical limitations of the facility making it more difficult to maintain acceptable health and sanitary standards will be decreased. Further, the provisions of the proposed order deal specifically with health and sanitary problems allegedly created in part by inadequate plumbing, heating, ventilation, and electrical systems, as well as poor maintenance practices.

2. *Inmates are not provided with meaningful rehabilitative opportunities because of inadequate counseling, as well as educational and vocational programs.*

The defendants in their settlement proposal have committed themselves to requesting appropriations for additional counselors. In addition, it provides for more meaningful communication between the prisoners and administration which should facilitate inmate input in the planning and administration of educational as well as vocational programs. Two other settlement proposals may have even a greater impact on these concerns—depopulation and the revisions in the classification system. Depopulation will reduce the number of individuals who need to be accommodated in the programs, and the new classification system potentially will result in the reclassification of some inmates to lesser security grades, allowing their greater participation in programs.

3. *Correctional officers have a bad attitude toward and poor relationship with the prisoners because of inadequate training and qualifications.*

The provisions of the settlement proposal deal directly and effectively with this problem, a problem the Court believes is one of the most explosive and dangerous at the penitentiary. The settlement calls for increased appropriations to support an increase in the number of guards employed and for more extensive training programs for guards. As indicated above, the proposed decrease in population as well as reclassification of inmates should serve to further ease the pressure between guards and inmates. Better trained and more qualified correctional officers in an improved physical environment with less inmates, all of whom are more accurately classified, will contribute to a more positive relationship between inmates and guards. If inmates are treated with consideration and understanding, most will respond positively, thus making the guards' job easier and prison life more tolerable.

4. *Fire and health emergency procedures are not adequate to protect the safety of the inmates.*

Upon a review of the proposal submitted by defendants to plaintiffs for settlement, it is evident that the issue of emergency procedures was a central area of concern for all parties involved. The proposal contains detailed adjustments to lock up procedures, training given to guards, ventilation

systems, inspection and monitoring schedules, medical policy and procedures, and other matters. Many terms of the proposed consent order respond to criticisms of procedures leveled by the court-appointed experts in their reports. The Court is convinced that the suggested procedures will be beneficial to the health and safety interests of the inmates.

5. *Prison is too crowded.*

Although the present population has not created intolerable conditions, the defendants apparently recognized both the short term and long term problem with the increasing prison population at the penitentiary, and offered positive steps in the settlement proposal toward eliminating the problem. The two major steps initiated include the mandate for reducing the population of the institution and revamping of the classification system. In addition, other provisions found in the proposal calling for the upgrading of the physical facility itself as well as its support systems, increased maintenance activities, and improved health and safety procedures will help eliminate many of the ills that can be created by overcrowded conditions. The Court believes that relevant provisions of the decree when implemented will work to the substantial benefit of the inmates.

6. *Cells for the general prison population are too small.*

The Court has reviewed applicable case law regarding the penitentiary's present cells, which are forty-eight square feet, in light of the plaintiff class' demand for an increase in cell size to sixty square feet. The Court here is not faced with the issue of cell size in the context of double celling, dormitory arrangements for inmates, general overcrowding, or grossly inadequate living space as other courts have been. See *Ramos v. Lamm*, 485 F.Supp. 122 (D.Col.1980); *Battle v. Anderson*, 447 F.Supp. 516 (E.D.Okl.1977); *Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977), aff'd 624 F.2d 1099 (6th Cir. 1980); *Gates v. Collier*, 423 F.Supp. 732 (N.D.Miss.1976). Instead, this Court must consider if the cell size at the penitentiary violates the Eighth Amendment rights of general prison population inmates when they have the opportunity to spend substantial periods of time outside their cells and there are no other significant conditions of general overcrowding. See *Finney v. Hutto*, 410 F.Supp. 251, 254 (E.D.Ark.), aff'd 548 F.2d 740 (8th Cir. 1976), aff'd 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.... The amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100–01, 78 S.Ct. 590, 597–98, 2 L.Ed.2d 630 (1957). The Court is convinced that the inmates constitutional rights are not violated under the present circumstances, and therefore, their interests are in no way harmed by approving the settlement which contains no provision for enlargement of cells. In addition, it would not be efficient to commit the resources to the enlargement of the cells. The funds can be better spent on improving other conditions for the prisoners. It may very well be that the inmates are focusing on the issue of cell size in an effort to reduce the prison population and gain release for a substantial number of themselves.

7. *"Honor Lifers" fear they will lose some advantages they have at the present time.*

Upon review of the terms of the settlement proposal, the Court is unaware of any provision that would deprive the "lifers" of any privileges they presently have that the Court could in deciding constitutional issues preserve for them. If their ranges in cellhouse 17 are closed their present advantages may be lost, but there is good reason to believe that the administration will compensate them in some way because it is to everyone's benefit to do so.

8. *Craft and hobby privileges no longer will be allowed in the inmates' cells.*

The settlement does not eliminate the above privileges, and in fact specifically provides for the maintenance of hobby craft

items in the cells "but at a level and in a manner as to satisfy the health and safety recommendations of the Iowa State Fire Marshal and the Iowa Commissioner of Health." In light of the great concern expressed by inmates over the health and safety practices at the penitentiary, the Court feels that the above provision is reasonable.

9. *Cellhouse 17E should be improved or closed immediately rather than being used until 1985 as contemplated in the settlement.*

The Court recognizes the inmates' concerns over the conditions in cellhouse 17. The settlement, however, does provide for many improvements in its condition that will make it a more acceptable living area. Use of the cellhouse is to be discontinued in April of 1985, and the Court believes that it should be vacated by that date or sooner, if possible.

10. *Inmates are confined in the maximum security unit that should be classified as medium or minimum security risks.*

In direct response to this concern, the parties negotiated for changes in the classification system. The stated purpose of the classification system as found in the proposed consent order is to "place inmates in the least restrictive security system consistent with public and inmate safety." Thus, even though plaintiff's counsel contends that the classification provisions are inadequate since they allow a facility to house inmates classified in one or more security grade levels, the Court believes the provisions are in the class' interests. It is critical that the issue of overclassification be dealt with since it contributes to overcrowding, tension and fear at the institution.

11. *Inmates experience an ever present fear of injury or death at the hands of correctional officers or other inmates.*

Steps which are to be taken under the settlement agreement previously discussed to improve the relationship between the guards and inmates should reduce or eliminate the unwarranted use of excessive physical force by guards upon prisoners.

At the same time, it must be recognized that in a prison setting incidents occur that require the use of force to subdue or restrain inmates.

Neither party has shown interest in making an issue of the inmates' fear of death or injury at the hands of other inmates. The administration apparently is reluctant to recognize that there is a problem. The named plaintiffs did not want to make that accusation. One of the experts testified that he could feel fear and tension as he toured the institution. Several objective bits of evidence support his subjective reaction. The number of reports of physical assaults, the number of inmates seeking protective custody, the number who prefer to work on their hobbies in their cell rather than be on the yard, the monopolization of recreational activities by certain groups, and the lack of participation in vocational and educational programs all support the inference that there is a fear for one's safety in a large number of the prisoners. Several of the confidential comments also express this concern. The fear of personal assaults at the Iowa State Penitentiary is a valid one.

An inmate in a penal institution has a constitutional right secured by the Eighth and Fourteenth Amendments to be " '... reasonably protected from constant threat of violence and sexual assault by his fellow inmates.' " *Ramos*, 485 F.Supp. at 155. The courts have a duty to protect prisoners from treatment that adds punishments to the sentence imposed. *Chapman*, 434 F.Supp. at 1019.

The last constitutional right that an inmate should lose is his right to be secure from physical and psychological attacks. Not only should the inmate be free from direct physical or sexual assaults, but he should not be compelled to engage in nonassaultive homosexual activities to secure the protection of a stronger fellow inmate. There is no specific evidence upon these issues, but the existence of that situation in prisons generally is well recognized. The assaultive atmosphere is a critical issue that cannot be ignored. At the same time, the

Court recognizes that this basic right is very difficult to protect in a maximum security institution setting.

Contrary to the opinion of plaintiffs' counsel, however, the Court believes the settlement is responsive to the concern. By depopulating the institution, reclassifying the security status of inmates, increasing the number of guards and improving their training, and upgrading the general physical conditions as well as maintenance practices at the institution, the environment for the class members should be improved. As a result, the interests of the class can best be served by adoption of the settlement.

Plaintiffs' counsel also questioned the propriety of dismissing plaintiffs' claims for monetary damages when there was opposition from the class to the settlement proposal in view of the Court's finding that the inmates constitutional rights have been violated. The violations found by the Court were based upon the totality of the conditions under which the general prison population lived. These conditions, as well as the other specific conditions challenged, affect the class as a whole and it would be difficult to prove any substantial damages to individual inmates. As the awards of damages, if any, would likely be minimal, the Court is of the opinion that the broad relief found in the proposed consent order is far more beneficial to the individual class members than the prospect of recovering damages on individual claims. The main thrust of this action has been for declaratory and injunctive relief rather than damages. The best interests of the class and the individual members thereof are served by the approval of the consent order.

In conclusion, the Court finds that the settlement agreement is fair, reasonable, adequate, and in the best interests of the class members. The Court hereby accepts the proposed settlement on behalf of the plaintiff class and approves the consent order as submitted pursuant to its duties and obligations under Federal Rule of Civil Procedure 23(e).

IT IS THEREFORE ORDERED:

1. The proposed consent order, appended hereto, is hereby approved.

2. Pursuant to the provisions of such agreement, all other requests for declaratory and injunctive relief, as well as requests for compensatory and punitive damages, are dismissed with prejudice.

3. The parties shall comply with the terms of the proposed consent order, and the terms of the proposed consent order are incorporated herein by reference.

4. Upon motion of either party, or upon petition of any member of the class of plaintiffs, the Court may at any time hold further hearings to determine compliance with the proposed consent order and judgment, and may enter such other orders as may be necessary to enforce the provisions of this Order and will retain jurisdiction for these purposes.

## APPENDIX

### ORDER

STUART, Chief Judge.

The Court has before it the above-captioned class action brought on behalf of all present and future general prison population inmates at the Iowa State Penitentiary, Fort Madison, Iowa. The action is a conditions of confinement suit which alleges in Division VI that the various conditions existing within the general population at the penitentiary when viewed together violate the plaintiffs' constitutional right to be free of cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments. The plaintiffs further allege that specific conditions violate rights vested in them by the federal Constitution and laws of the State of Iowa.

The Court has been presented with extensive evidence in this matter, including testimony and exhibits received in the fifteen days of trial and submitted upon the stipulation of the parties. In addition, the Court has before it as evidence in this case the reports of various experts submitted upon its request. Ruling has been withheld on the merits of this action for some time because the parties have been engaged in

extensive settlement negotiation. It has recently come to the Court's attention that even though significant progress was made toward settlement, negotiations are no longer being conducted and outstanding offers, made by the defendants, have been rejected by the named plaintiffs. Therefore, the Court considers the matter fully submitted and will proceed to consider the issues.

After reviewing the record, the Court hereby finds that the evidence supports plaintiffs' allegations in Division VI. The totality of conditions of confinement in the general prison population at the Iowa State Penitentiary constitute the infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Specific findings of fact and conclusions of law will be contained in an Order to be filed at a later date in which the Court will also address the specific conditions alleged to be unconstitutional. The Court is proceeding in this manner with the expectation that it will expedite final resolution of these matters.

Since a determination has been made that the plaintiffs' constitutional rights have been violated, the Court must fashion remedies so as to bring the conditions for the general prison population at the penitentiary within the requirements of the Constitution. The Court is aware that some steps have already been taken by the defendants in this action to upgrade conditions in the institution. Further, the extensive settlement negotiations reportedly resulted in settlement documents outlining possible remedial action. Therefore, the parties are hereby directed to submit to the Court within five (5) days of the date of this Order copies of the proposed settlement documents. The Court believes this information will be of great assistance to it in its attempt to fashion appropriate remedies.

Since the settlement documents may represent compromise positions rather than the adversarial views of the parties on the issue of remedies, however, they shall be given the opportunity to express their positions fully. The parties are hereby given ten (10) days from the date of this Order in which to file comments on the settlement documents or make additional suggestions regarding the issue of remedies for the elimination of the constitutional deficiencies. The parties are then hereby given five (5) days from such filing to respond to the other parties' comments.[1] Based upon the aforementioned information as well as applicable case law, the Court will determine what action must be taken by defendants to eradicate the unconstitutional conditions.

Before the Court addresses the individual constitutional claims, the Court requests the defendants to supplement the record by submitting copies of all reports of physical assaults made at the Iowa State Penitentiary by general population inmates during the years 1978, 1979, and the first two months of 1980. Such reports will be reviewed in camera by the Court.

IT IS SO ORDERED.

Signed this 27 day of February, 1981.

### ORDER

STUART, Chief. Judge.

On February 27, 1981, this Court held that the totality of the conditions of confinement in the general prison population of the Iowa State Penitentiary at Fort Madison constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. To assist the Court in formulating appropriate remedies, the Court required that the final settlement proposal made by the defendants to the plaintiffs be filed. The parties were given time to comment thereon and to reply to the comments of the opposition. The Court

---

1. The Court is aware that the general finding of unconstitutionality gives the parties little, if any, guidance as to which alleged specific constitutional deficiencies they should consider in suggesting remedies. If after examining the settlement documents and the comments thereon, the Court believes additional suggestions on these specific constitutional allegations would be helpful, they may still be requested.

also requested copies of reports of physical assaults by general population inmates covering a specified time period. Such filings have now been completed.

After having examined the settlement proposal in light of the evidence presented, reports submitted, comments made and the prevailing case law, the Court believes that the settlement proposal, if implemented, would satisfy the constitutional objections to the conditions of confinement of the general population in the Iowa State Penitentiary. In the Court's opinion, it appears that the best interests of the class of present and future inmates of such institution would be served if the settlement agreement was consummated and approved by the Court.

The Court is aware that the named plaintiffs and other inmates involved in the settlement conferences have rejected the settlement, disavow any interest in attempting to reach a settlement with the defendants, and have requested the Court to decide the case upon the constitutional issues. Under the present state of the record, however, the Court can conceive of no valid or reasonable objections to the courses of action required of the defendants by the settlement proposal. The named plaintiffs, however, do not have the final say as to what is in the best interest of the class they have been named to represent. They cannot settle a case upon terms that are not in the best interest of the class. They should not, by rejecting a settlement offer, be able to forestall a settlement if settlement would be in the best interest of the class. If in the Court's opinion the position taken by the named plaintiffs is not reasonable and does not serve to further the best interests of the class, it is the obligation of the Court to take steps to see that the interests of those in the class who are not present in court are fully protected and served. See *George v. Parry*, 77 F.R.D. 421, 424 (S.D.N.Y.), aff'd 578 F.2d 1367 (2d Cir.), cert. denied, 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Held v. Missouri Pacific Railroad Co.*, 64 F.R.D. 346, 347–48 (S.D.Tex. 1974). This is especially true in a situation such as this where the class includes presently unidentifiable future inmates of the institution and the class representatives' reasons for rejecting the settlement are not apparent.

Whether the Court is called upon to approve or disapprove a proposed settlement or to fashion remedies of its own, the Court will be deciding the constitutional issues as plaintiffs request. In either event, the class can be assured that constitutional standards will be met. In formulating its own remedies the Court can go no further than requiring that the conditions of the general population be brought up to minimal constitutional standards. The Court could not approve of a settlement that did not also satisfy minimum constitutional standards. The settlement proposal appears to contain many viable, practical and reasonable remedies which at least meet constitutional standards. Under the record as it now exists, the Court cannot perceive how the class could be injured by settlement of this case. By settling, the class may get benefits that the Court on its own could not award.

If the settlement were approved, the Court would not be called upon to decide which, if any, of the specifically alleged conditions violate the constitutional rights of present and future inmates. Without intending to intimate what the Court's findings and conclusions might be on the constitutionality of the specifically identified conditions, the areas of primary concern which the Court would be called upon to address are:

(1) The danger to the health and safety of inmates presented by the improper construction and maintenance of water, electrical and sewer facilities.

(2) The dangers to the health and safety of the inmates existing under current procedures in the event of fire or health emergencies.

(3) The dangers to the health of inmates created by improper procedures in and the maintenance of the food service facilities.

(4) The adequacy of the training of prison staff, particularly of correctional officers, and their conduct and attitude toward the inmates and their jobs.

(5) The danger to the health, safety, and well-being of inmates imposed by physical attacks by other inmates or threats thereof.

(6) The confinement in a maximum security facility of inmates who do not require such close supervision and restrictive way of life.

In the Court's opinion, the courses of action contemplated in the settlement proposal, if carried out, provide appropriate remedies by which the Court's concerns on all of these issues could be resolved. It would appear to be to the State's advantage to have a comprehensive plan which deals with the disputed issues and existing unconstitutional conditions. It might be difficult and inefficient for defendants to satisfy individual and separate requirements which the Court might order. It is to the class's advantage to have all the issues addressed and efforts to alleviate deficiencies commenced, thus eliminating the probability that the Court might hold some of the specific concerns do not reach constitutional dimensions and limit relief granted to remedies designed to meet only minimum constitutional standards.

One aspect of the settlement proposal troubles the Court. The most serious deficiencies will require funding. The defendants have no funds available to comply with various terms of the settlement proposal, so the funds must come from legislative appropriations. The defendants have agreed to use their best efforts to obtain the necessary funds. All they can do, however, is request the necessary appropriations from the Legislature. "Best efforts" and "requests" would appear to satisfy the requirements of the settlement agreement, but such action by the defendants will not remedy existing constitutional deficiencies. Funds with which to implement the settlement agreement are necessary. Although legislative leaders have been advised of the basic concepts of the settlement agreement and have indicated general approval, they cannot guarantee what, if any, action will be taken by the Legislature. If the Court, after proper notice to the class, determines that the proposed settlement agreement

should be consummated and approved, such approval would necessarily be contingent upon legislative action exemplifying good faith efforts to perform the obligations contained in the proposed settlement. Failure on the part of the Legislature to substantially fund the settlement programs would require the Court to reassert its authority by making specific constitutional findings and fashioning related remedies.

The defendants' comments concerning the settlement proposal indicate that they are at the present time still willing to agree to the terms contained therein. For the reasons heretofore expressed, the Court believes that under the present record it would be in the best interests of the class of present and future inmates to accept such settlement proposals. The identifiable members of the class, however, must be given notice of the Court's position on the proposed settlement and the opportunity to express objections thereto. The Court has attached the notice form to be given the class, and the defendants are hereby directed to circulate such notice in the same manner the prison newspaper is circulated to the inmates. To further facilitate proper notice to the class, the Court hereby directs the defendants to place twenty (20) copies of their proposed settlement offer and of this Order in the law library at the institution for review by members of the general prison population.

The Court believes the form of notice is sufficient since all identifiable class members are located in the institution. Further, copies of the proposed settlement, rather than a summary of such, as well as this Order of Court summarizing the substance of the action and other pertinent matters, will be made available to the class members. The notice itself is brief and is designed to make interested inmates aware of the proposed settlement, indicate to them that additional information is available, and to put them on notice of their right to comment on the proposal.

IT IS THEREFORE ORDERED that the defendants shall within ten (10) days of the date of this Order and at their own cost

circulate the attached Notice of Settlement to the inmates of the Iowa State Penitentiary in the same manner the prison newspaper is circulated.

IT IS FURTHER ORDERED that the defendants shall within the same time frame place twenty (20) copies of their proposed settlement offer in the law library at the Iowa State Penitentiary at their cost for review by members of the general prison population. The Court will provide defendants with twenty (20) copies of this Order for placement in the law library of the Iowa State Penitentiary within ten (10) days of the date of this Order.

Signed this 17 day of March, 1981.

## ORDER

STUART, Chief Judge.

Counsel for the plaintiff class has filed the comments and objections to the settlement proposal requested by the Court. He has not, however, commented directly upon the advisability of settling the case upon the terms offered by the defendants rather than having the Court resolve the issues on the merits of the constitutional issues presented. The Court has the impression that counsel for the class was sufficiently satisfied with the terms of the final settlement proposal to submit it to the class representatives for their consideration. After a lengthy conference, the class representatives rejected the settlement proposal. The Court is interested in knowing whether the reasons expressed by the class representatives for rejecting the settlement proposal have changed counsel's opinion as to the advisability of settling the case upon the terms offered.

The Court, therefore, requests counsel for plaintiff class to state whether, in his opinion, the best interests of the plaintiff class of present and future general prison population inmates of the Iowa State Penitentiary would be served by accepting the settlement proposal or by leaving the matter for the decision of the Court on constitutional issues. If counsel expresses the opinion that the class interests would best be served

by a court decision on the merits, the Court further requests counsel to point to relief he would expect for the class under a court decision which is of greater benefit to the class than that found in the proposed settlement. Plaintiffs' counsel is directed to file his response to this request on or before the 27 day of March, 1981.

IT IS SO ORDERED.

Signed this 17 day of March, 1981.

## PROPOSED CONSENT ORDER

STUART, District Judge.

This matter comes on for review of this Court, by stipulation of the parties, to consider entry of a consent order to resolve the request for declaratory and injunctive relief, as well as any request for compensatory and punitive damages. The Court hereby finds that it has jurisdiction in this matter pursuant to 28 U.S.C. § 1343 and that the action is properly maintained under 42 U.S.C. § 1983.

## GENERAL PROVISIONS

1. This Order represents a compromised settlement of disputes between the parties.

2. This Order may include specific requirements and procedures beyond what is required by the Constitution of the United States of America and Constitution of the State of Iowa, or any other statutory or common law requirement. This Order shall not be construed to establish or change the current standard of civil liability for any official, employee, agent, or representative of the State of Iowa. The sole purpose of the provisions herein is the enforcement of this Order.

3. The provisions of this Order, mutually and voluntarily effectuated by the Plaintiffs and Defendants, do not constitute admissions that any previously existing condition, policy, procedure, or acts or omissions of the Defendants were, or are, in any way improper, negligent, unconstitutional, or in violation of any rights of the Plaintiff class. Nothing in this Order shall constitute findings of fact or law with respect to the

claims or defenses of the parties to this action.

4a. The basic concepts contained in this Order have been reviewed with the leaders of the Iowa General Assembly and have met with general approval. The Defendants do not have authority to appropriate funds to carry out the terms of this Consent Order. The Defendants shall use their best efforts to obtain from that body such appropriations as are necessary to implement the terms of this Order.

4b. This Order shall serve as a release by the Plaintiff class, and all individual members thereof, of all claims for declaratory or injunctive relief, or for compensatory or punitive damages, in the instant action.

## MONITORING

5. Compliance with the provisions of the consent decree shall be monitored semi-annually for the first year following its entry. Thereafter, monitoring shall occur on an annual basis. The monitoring task shall be performed by a committee composed of the Iowa State Fire Marshal, the Iowa Commissioner of Health, and the Regional Director of the Federal Bureau of Prisons or their designees.

6. Upon completion of their inspection, the monitoring committee shall submit a written report to the Court of their findings with respect to compliance with the provisions of the decree. Copies of these findings shall be made available to counsel for the parties.

## FIRE SAFETY

7. No black neoprene mattresses nor urethane pillows shall be used at the Iowa State Penitentiary. All mattresses and pillows used shall be approved by the State Fire Marshal.

8. All electrical wiring in the cellhouses shall be brought up to and maintained in accordance with the 1981 National Electrical Code. In addition, all heating and electrical equipment in the housing, industrial, laundry and kitchen areas shall be maintained according to standards in the 1981 National Electrical Code.

9. Fire extinguishers shall be maintained in proper working condition and shall be affixed in permanent locations. Fire hoses available for use at the Iowa State Penitentiary shall be maintained in proper working order.

10. "State" padlocks shall be removed from all occupied cells.

11. The use of personal padlocks by an inmate shall be confined to times when the cell is unoccupied, and shall be used only to further secure the personal property of the inmate.

12. Second fire exits shall be constructed in cellhouses 18 and 19, as a part of the unitization capital project currently proceeding at the Iowa State Penitentiary. This construction will be completed on or about November 30, 1982.

13. The auditorium shall have two fire exits.

14. Smoke exhaust and ventilation equipment will be installed in the general population cellhouses on or about July 1, 1983. Such equipment shall meet the approval of the State Fire Marshal.

15. The industrial facilities at the Iowa State Penitentiary are currently inspected by OSHA officials. Such facilities shall be maintained according to applicable OSHA standards, and the Defendants shall take the necessary steps to remedy deficiencies cited by OSHA. All deficiencies cited by OSHA shall be reported to the Court, and copies will be made available to counsel for the parties.

16. Fire hydrants throughout the Penitentiary shall be maintained in proper working order.

17. The Iowa State Penitentiary shall adopt procedures for key control so as to make keys to cells readily available to respond to emergencies between 10:00 p. m. and 6:00 a. m. This procedure shall insure the quickest possible cellhouse evacuation that reasonable and necessary security considerations will permit and shall be approved by the State Fire Marshal.

18. The Penitentiary shall draft an emergency fire response and evacuation plan which shall insure an evacuation of inmates from housing units within a reasonable time. This plan shall be in writing and circulated to all employees. Staff shall be thoroughly familiarized with the plan through periodic drills and through preservice and in-service training.

19. Hobby craft items in the cells shall be maintained, but at a level and in a manner as to satisfy the health and safety recommendations of the Iowa State Fire Marshal and the Iowa Commissioner of Health.

20. Correctional officers and security staff shall receive mandatory pre-service and in-service training in fire safety and prevention.

21. The Iowa State Fire Marshal shall be the member of the monitoring committee who assesses compliance with the provisions of this division. In addition to the specific provisions in this division, the Fire Marshal shall assess conditions at the Penitentiary for compliance with the 1976 Life Safety Code of the National Fire Protection Association, and shall report to the Court and to counsel for the parties on compliance with the Life Safety Code.

22. In addition to the fire inspections conducted by the monitoring committee, the Iowa State Penitentiary shall contract with the city of Fort Madison Fire Department to provide fire safety inspections three times per calendar year. The results of such inspections will be reported to the Court and to counsel for the parties.

## HEALTH AND SANITARY CONDITIONS

23. The Defendants shall adopt a plan to depopulate the existing maximum security portion of the Iowa State Penitentiary to a population of approximately 550. The depopulation shall occur in stages, and will be scheduled for completion on or about April 1, 1985.

24. The Defendants will proceed with and complete unitization in cellhouses 18 and 19. Assuming normal operation conditions at the Penitentiary, and based upon the normal availability of materials and labor, unitization will be scheduled for completion on or about November 30, 1982. Unitization in cellhouses 18 and 19 will provide the following:

a. Second fire exits;

b. Removal of all existing plumbing deficiencies in cellhouses 18 and 19, according to plumbing standards in Chapter 135, Code of Iowa.

c. A ventilation system capable of providing proper temperature control throughout the cellhouses, and capable of exhausting odors, in addition to the currently existing sewage exhaust system.

25. Broken windows and screens shall be replaced as soon as is reasonably possible. Inmates responsible for such breakage shall indemnify the State for costs of repairing or replacing broken windows and screens.

26. All plumbing cross connections between potable and nonpotable sources of water shall be corrected.

27. Cellhouse 17E shall be vacated as a regular living unit on or about April, 1985, and shall be used thereafter only for emergencies. A general increase in the total inmate population of the Iowa prison system shall not be considered an emergency for purposes of this paragraph.

28. All defective plumbing shall be replaced in cellhouses 18 and 19. The plumbing in cellhouse 17E shall be maintained as well as reasonably practical until the vacation of this cellhouse on or about April, 1985.

29. The roofs on the general population cellhouses shall be maintained so that they do not leak water.

30. The Defendants shall request an appropriation to create two positions for maintenance and repair supervisors.

31. Cellhouses shall be maintained at all times in a sanitary condition and necessary cleaning materials and tools should be readily accessible to those responsible for this task. This includes catwalk areas and win-

dow wells. Inmates assigned to perform such maintenance tasks shall properly perform these duties.

32. Standing water, food, garbage and other rodent harborage shall be promptly removed from the prison. Inmates assigned to perform such maintenance tasks shall properly perform these duties.

33. Upon assignment to an inmate, all mattresses shall be covered with fabric treated with staph check # 20 or a comparable disinfectant.

34. The supervisor of the waterplant shall be certified as a water works operator by the State of Iowa.

35. Solid waste receptacles located throughout the prison shall be maintained in a sanitary condition. Inmates assigned to perform such maintenance tasks shall properly perform such duties.

36. All food service operations shall be conducted in general compliance with the Iowa Food Service Sanitation Code, Chapter 170A, 1981 Code of Iowa. The Iowa Secretary of Agriculture, or his designee, will conduct semi-annual inspections for the first year following the entry of the consent decree to assess compliance with this paragraph. Thereafter, inspections by the Secretary of Agriculture, or his designee, will be conducted annually. Copies of the Secretary's findings will be made available to the Court and counsel for the parties.

37. Compliance with this division, except for the provisions in paragraph 36, shall be monitored by the Iowa Commissioner of Health.

## TREATMENT

38. The Defendants are requesting an appropriation to create a position for a full time librarian at the Iowa State Penitentiary.

39. The Defendants are requesting an appropriation for two activities specialists in addition to those now employed.

40. The Defendants are requesting an appropriation for two counselors in addition to those now employed.

41. The Defendants are requesting an appropriation to construct a new or remodeled visiting area or areas that will have at least twice the square footage contained in the existing South and North visiting rooms.

42. The prisoner advisory committee shall be reorganized and revitalized in order to give inmates an avenue to communicate with the prison administration.

43. The current mission statement of the Iowa Division of Adult Corrections shall be included in the next publishing of the Rules, Regulations and Disciplinary Procedures for the Government of the Iowa State Penitentiary.

## MEDICAL EMERGENCIES

44. Effective on or about October 1, 1981, a registered nurse shall be available at the Penitentiary 24 hours a day to respond to emergencies.

45. The Defendants shall draft a policy and procedure, in consultation with a licensed physician, delineating procedures for referral of inmates' medical complaints to medical staff by correctional officers. This policy and procedure shall also delineate procedures for response to medical emergencies by correctional officers.

46. Correctional officers shall receive training in first aid and cardiopulmonary resuscitation. Effective on or about July 1, 1982, there will be one officer per general population cellhouse on duty on the night shift who holds a current American Red Cross or American Heart Association Cardio-Pulmonary Resuscitation Certificate.

47. An inmate's custody status shall not be used as a criterion for deciding whether to transfer him to an outside medical facility or the prison infirmary in an emergency medical situation.

48. Inmates requiring emergency medical care beyond the capabilities of the Penitentiary's infirmary shall be transported to either Fort Madison Community Hospital, or to University Hospitals in Iowa City.

49. All nurses shall be allowed to have access to housing areas in emergency situations.

50. Compliance with this Division shall be monitored by the Iowa Commissioner of Health.

## STAFFING AND TRAINING

51. All correctional officers and security personnel shall receive a minimum of 15 hours mandatory in-service training per year. Staff assigned to the industrial area shall receive training in industrial safety. Staff assigned to sanitation maintenance shall receive training in this area.

52. The Defendants are requesting an appropriation for 32.5 additional correctional officers. Contingent upon an appropriation, these positions will be created in stages and will be fully effective on or about July 1, 1983.

53. The Defendants are requesting an appropriation for 20 correctional officers, in addition to those requested in paragraph 52, in order to allow 20 officers to participate in in-service training programs at all times. Contingent upon an appropriation, these positions will be created in stages, and will be fully effective on or about January 1, 1982.

54. The Defendants are requesting an appropriation for 24 correctional officers, in addition to those requested in paragraphs 52 and 53, in order to provide supervision in living units upon completion of unitization. Contingent upon an appropriation, these positions will be created in stages, and will be fully effective on or about November 1, 1982.

55. The Defendants are requesting an appropriation for two additional unit managers in order to provide supervision for unitization. Contingent upon an appropriation, these positions will be effective on or about November 1, 1982.

56. The number of correctional officers and other personnel at the Penitentiary may be reduced in order to adjust the Defendants' plan for depopulation at the Iowa State Penitentiary or other operational improvements.

## CONSTRUCTION SCHEDULE

57. Construction schedules set forth in this Order assume normal operation and conditions at the Penitentiary, and are based upon the normal availability of materials and labor.

## CLASSIFICATION

58. The Department of Social Services plans to initiate a classification system on or about July 1, 1981. The system shall become fully operational with respect to the Iowa State Penitentiary on or about July 1, 1983. The stated policy of the Department, with respect to implementation and development of the classification system is as follows:

The initial step in the development of the inmate classification system is the appointment of a coordinator of that system. This individual will provide central coordination of the system.

The coordinator will appoint a classification committee which will provide broad representation from the various functional units of the Division.

The committee will have the primary responsibility for initial classification and will have oversight responsibility for institutional placement and the reclassification process. Each institution will conduct classification reviews with oversight by the committee, making their decisions within guidelines set by the committee.

The centralized inmate management classification records keeping system will include both criminal and institutional histories, as well as selected other inmate classification criteria.

A reclassification process will be established which will provide for a periodic review of all inmates in the system. This reclassification review will be a legitimate reassessment of the inmate's institutional history to ascertain whether or not he is progressing in their individual program track, as well as assessing their behavior while incarcerated.

Each facility will be assessed and evaluated in terms of physical security and operational controls to determine the assigned security grade level(s) of that facility. Each facility may have one or more security grade levels within.

Each inmate will be assessed based on predetermined criteria as to their security grade level.

The primary purpose of the classification system is to place inmates in the least restrictive security system consistent with public and inmate safety.

59. Members of the Plaintiff class are hereby enjoined individually and as a group from any acts which would result in non-compliance with any of the provisions of this Order. Members of the Plaintiff class are hereby required to assist the Defendants in repairing and maintaining public property in the best condition possible by not damaging, destroying, or misappropriating public property at the Penitentiary. Members of the Plaintiff class are further enjoined from threatening or otherwise harassing institutional staff or contractual employees charged with carrying out the provisions of this Order.

## CONTINUING JURISDICTION

60. The Court shall retain jurisdiction in this matter in order to assess compliance with its provisions. The Plaintiffs and Defendants shall abide by the provisions of this Order until this Court either modifies the Order or discharges the parties from further compliance.