William **GROSECLOSE**, et al.

v.

Michael **DUTTON**, et al.

No. 3–84–0579.

United States District Court,
M.D. Tennessee,
Nashville Division.

May 24, 1985.

Larry Woods, Jinx Woods, William J. Marett, Jr., and Irwin Venick of Woods, Bryan, Woods & Watson, Nashville, Tenn., for plaintiffs.

Bill Redick, Richard McGee, Nashville, Tenn., and Hal Hardin, Guardian ad Litem, Nashville, Tenn., for Harries.

William M. Leech, Jr., Atty. Gen., State of Tenn., John Southworth, Robert Grunow, Robin J. Mitchell, Asst. Attys. Gen., Nashville, Tenn., for State of Tenn.

MEMORANDUM

JOHN T. NIXON, District Judge.

This is a bifurcated case that was originally filed as a next friend action by William Groseclose, Reverend Joseph Ingle, the Southern Coalition on Jails and Prisons, and the Tennessee Chapter of the American Civil Liberties Union, individually, and on behalf of Ronald Harries. Groseclose and Harries are prisoners who are confined to Unit VI at the Tennessee State Penitentiary and have been sentenced to death. Although Mr. Harries had avenues open to appeal his sentence of death, he announced he would forego those appeals because of the adverse conditions of his confinement. Subsequently, the plaintiffs brought this action as next friends on his behalf. On June 7, 1984, this Court stayed Mr. Harries' execution in order to determine his competency to act in his own behalf. The Court also ordered the defendants to cease administering antianxiety drugs to Mr. Harries. On June 8, 1984, Hal D. Hardin, Esq., was appointed as guardian ad litem to represent the interests of Mr. Harries.[1] On June 11, 1984, the Court further ordered (1) the removal of Mr. Harries from death watch, (2) the extension of the stay of execution pending further orders of the Court, and (3) the setting of an evidentiary hearing. On June 22, 1984, Mr. Harries sought permissive joinder to act in his own behalf. A hearing was held on July 12, 13, and 16, 1984. At the hearing, the Court granted Mr. Harries' motion to join, and the parties presented evidence that included all allegations raised affecting Mr. Harries' decision to forego further judicial review of his conviction. These included the issue of competency and the issue of lack of voluntariness due to adverse prison conditions. On August 17, 1984, the Court issued a Memorandum and Order, which concluded that as a matter of law Mr. Harries was incompetent and that plaintiffs, therefore, had standing to challenge his decision to forego his appeals. The

Court also stayed his execution pending final disposition of this proceeding. *See Groseclose v. Dutton,* 594 F.Supp. 949, 962 (M.D.Tenn.1984). Although the Court found that conditions in Unit VI had caused Mr. Harries to waive his rights of appeal involuntarily, the Court made no finding as to the constitutionality of the conditions in Unit VI. *Id.* at 961–62.

On November 9 and 13, 1984, the Court certified a class of those persons who are death sentenced inmates currently residing on death row and those future inmates who will be confined in Unit VI under sentence of death. After a hearing on December 18, 1984, the Court issued a preliminary injunction requiring the defendants to permit the plaintiff class to hold a congregate religious ceremony. Also on December 18, the Court issued an Order bifurcating the civil rights cause of action and the habeas corpus cause of action. The civil rights cause of action came on for trial on January 14, 15, 16, and 18, 1985. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

A. *Unit VI*

Unit VI is a compound located within the confines of the Tennessee State Penitentiary. There are two visitation rooms at the front of the building. There are four walks, two outside walks that permit natural light through translucent glass and two inside walks with no natural light. Each walk contains fluorescent lighting that remains on twenty-four hours a day. Many inmates have fashioned cardboard shades in order to block the light while sleeping. There are two death watch cells that are separate from the walks and immediately adjacent to the death chamber. In order to enter the cellblock area, it is necessary to pass through one locked door and then through the locked door for each walk.

---

1. Mr. Harries was also represented at the time and throughout these proceedings by Richard McGee, Esq., and William Redick, Esq.

Each cell is also individually locked. Outside the walks, but inside the cellblock, is a small room known as the law library. The defendants acknowledge that the room is merely a meeting room with some old law books in it. Between the walks are ventilation chambers, which also contain some of the plumbing for the cells. Immediately behind the facility is a small exercise yard with a steel mesh sheet overhead. The yard is approximately twenty feet in width and sixty feet in length. At one end of the yard is a covered passageway leading to a larger exercise yard, which contains basketball facilities. The large exercise yard is shared with Unit I.

## B. *The Cells*

Nine cells in Unit VI are approximately thirty-five square feet, and the remaining thirty-nine cells are approximately forty-four square feet. Although only one inmate is housed in each cell, each cell contains a double bunk. With the space taken up by the bunk, an inmate has enough room to take approximately three paces, turn around and take three paces back. Each cell contains a combination toilet and wash basin, and some cells have old-fashioned concrete toilets. Although replacement commodes made of stainless metal have been available for two years, they have not been installed in all cells. Homemade repairs, such as cardboard lids, are used to try to reduce the odor associated with the toilets. The cells do not contain windows. Ventilation and odors have been a serious problem in Unit VI. Often the stale air, laden with cigarette smoke, malodorous emissions from toilets, and paint fumes, make existence in the cells extremely uncomfortable. Insect infestation is a problem for the inmates. Defendants acknowledge that some inmates do not use bug spray in their cells because of the added odor from the insecticides.

There is no natural light on walks 2 and 3 and minimal sunlight on walks 1 and 4. The State provides a single low wattage light bulb that renders reading difficult if not impossible for any prolonged period.

Dr. Dorothy O. Lewis, a Professor of Psychiatry at New York University, Bellevue Medical Center, and a clinical Professor of Psychiatry at Yale University Child Study Center, testified that both the cells and the walk on which Mr. Harries was housed were very dark. Dr. Seymour Leon Halleck, a Professor of Psychiatry at the University of North Carolina Medical School and Adjunct Professor of Law at the University of North Carolina Law School with extensive experience in criminology, described the walks on Unit VI as giving one a sense of being entombed. The lack of natural lighting has had an adverse impact on the sleep cycle of many, if not all, inmates. Many inmates remain in their bunks twenty hours a day or more.

Inability to regulate indoor temperatures in the summer and winter also presents significant problems for the inmates. The evidence indicates that in the summer temperatures in the mid-eighties and higher are common. Inmates sometimes must remove their clothing because of high temperatures. Dr. Halleck testified that after he spent part of a rainy, cold day inside Unit VI, he left the facility "shivering." Transcript of Proceedings, January 14, 1985, at 39 (hereinafter cited as "Transcript").

Dr. Lewis testified that, based on her tours of death rows in several states, Tennessee had the worst death row that she had seen. She compared it to cages in a zoo. Dr. Halleck testified that of the death rows of which he was aware, it was the worst in the nation in terms of the deprivations, lack of exercise, and lack of human contact. Dr. Harold Jordan, former Commissioner of Mental Health for the State of Tennessee, described the conditions as inhumane, deplorable, and completely lacking any stimuli. Reverend Joe Ingle concluded, based upon his experience as Director of the Southern Coalition on Jails and Prisons, his numerous publications about death rows and death penalty cases, and his visits to every death row in the South, that because of the "extraordinarily long hours that the men are locked down in their cells, the overwhelming idleness of the men ...

and the lack of programs available for the men and the absence of diagnostic and classification procedures to identify their respective personalities, traits, and problems [,] ... the conditions and circumstances under which condemned men are confined on the Tennessee death row fail to afford even minimal levels of basic human decency...." Expert Testimony of the Reverend Joseph B. Ingle pursuant to Local Rule 11, Plaintiffs' Exhibit 205, at 21. Ingle considered only the Louisiana death row worse because of its lack of electricity and "dog runs" for exercising the inmates.

#### C. *Classification*

The defendants use no system of classification for the inmates housed in Unit VI. All death sentenced inmates are considered the same in terms of security risk and needs. The only classification they go through is completion of a one page personal data information sheet. Individuals are assigned to Unit VI based entirely on their sentences and, rather than undergoing normal classification procedure, they are automatically assigned the most restrictive classification, "mandatory segregation." That classification is changed to a less restrictive classification only if the sentence of death is lifted. Ronald Bishop, Deputy Commissioner of Corrections, testified that the officials do not normally conduct any psychological or personality testing of the inmates sentenced to death. Although some death sentenced inmates have been classified, that classification has had no impact on their treatment while confined to Unit VI.

All other inmates in the Tennessee penal system are routinely classified by administration of psychological testing, personality testing, aptitude tests, medical and dental examinations, initial entry counseling, and similar methods. The classification system mandated by state law is used to determine what level of security is required for the inmate and what the needs of the inmate are. Classification enables the institution to identify violent tendencies and escape risks from those with minimal escape tendencies.

The plaintiff class is composed of individuals who have been convicted of murder with aggravating circumstances.[2] For this reason the prison administration has determined that these individuals must be segregated from the general prison population. From the evidence presented at trial, it is clear that there is disagreement among professional correctional authorities as to whether segregation of death sentenced inmates is necessary.

#### D. *Out of Cell Time*

The evidence indicates that the inmates typically spend more than twenty-two hours per day locked in their cells. The inmates may leave their cells for one hour of outdoor exercise daily in the small exercise yard. This yard contains weights, a bench, and a punching bag. The small yard is completely enclosed, including the steel mesh "roof" through which officers view the inmates while they are in the yard. Once every four days the inmates use the large exercise yard, which is shared with Unit I. No inmates from Unit I are in the larger yard when the Unit VI inmates are using it. Inmates are permitted to shower immediately after their exercise as part of their one hour exercise period.

Within the building in which the cells are located are two visitation rooms and one room known as the law library. The visitation rooms are used only for inmate contact with the outside world. The "law library" is a small room used by individual inmates or by small groups of inmates. Inmates must sign up to use the law library, and the typical waiting period is three days.

Inmates also may receive out of cell time by acting as "rockman." One man from each walk may volunteer and serve as a rockman, and the positions are rotated daily. The designated rockman cleans the walk, collects trays, and talks with the

---

**2.** Aggravating circumstances include prior convictions, the nature and circumstances of the crime, or other factors. TENN.CODE ANN. § 39–2–203.

other inmates on the walk. Five inmates rotate as rockman for the area on the crosswalks in Unit VI.

Death row inmates are not permitted access to the commissary, although they may order items from it. They have no access to the gymnasium, nor do they have access to work programs. The inmates may not visit the prison's law library, although they may order books from it. With the exception of the ceremony pursuant to this Court's Order of December 18, 1984, inmates are not allowed congregate religious ceremonies, although they may meet with ministers in the visitation rooms. The inmates are not allowed to have formal educational classes. Inmates have no access to a dining area and must eat their meals alone in their cells. The defendants maintain that all of these restrictions have been imposed for valid security reasons.

### E. *In Cell Time*

There are prolonged periods of idleness in Unit VI because the institutional policy is one of "deadlock," which means that the death sentenced inmates are to be locked down twenty-four hours a day, except when exercising, showering, or receiving a visitor. As Warden Dutton admitted, this means that inmates are confined to their cells more than twenty-two hours each day. Defendants do little to alleviate the boredom, and the inmates are largely powerless to take any steps to relieve the tedium.

The extremely cluttered and crowded conditions in the cells preclude exercise opportunities within the cells. Religious counseling in the inmates' cells is no longer available. There are no in cell work programs. The State does not pay for correspondence courses. Especially in the summer, the heat and poor ventilation combine to inflict even more lethargy and idleness upon the inmates. Although radios and televisions are not provided by the State, many inmates possess them and thereby while away their in cell hours. Although radios and televisions may be necessities to the inmates, their collective blare only adds

to the overall sense of defeat that prevails in Unit VI.

The prison counselor visits inmates in the cells for short periods of time and, considering the proximity of the cells, private conversations with him are impossible. Only one counselor is assigned for all forty-four inmates on death row, and that person is also the sole counselor for Unit I, which has over eighty inmates. As Dr. Halleck testified, "[t]he absence of any kind of work, the absence of any kind of education, the absence of any kind of group meeting and primarily the absence of any opportunity to talk to anybody except by screaming across the cells, that kind of inactivity ... makes for depression and lethargy." Transcript, at 35.

### F. *Necessities*

There is no evidence before the Court to indicate that the food provided the inmates on Unit VI is not nutritious. However, all meals must be eaten in the cells, often near a malodorous cement commode. Medical services regarding physical ailments appear to be adequate. Sick call occurs daily, and there is no indication that inmates who have emergency medical needs are ignored. The most evident medical problem of a physical nature is the lack of out of cell opportunities and consequent deterioration of physical health.

The emotional needs of the inmates are another matter. The Court finds that the evidence is overwhelming that the defendants have not provided the inmates with adequate psychological and psychiatric assistance necessary for one confined and sentenced to death. Dr. Halleck testified that inmates facing a sentence of death have emotional problems that are different from those of other inmates. Virtually all witnesses who testified as to conditions at Unit VI supported the idea that emotionally the inmates housed there were different from the remainder of the inmate population. The only effort by defendants to deal with these problems is to make available the counselor, George Keeling, who meets with the inmates at their cells without ben-

efit of privacy for a total of one to two hours per week for the entire Unit VI population.

### G. *Fire Safety*

The defendants' policies require that fire evacuation training and a fire drill be conducted every three months. Warden Dutton admits that this policy has never been followed in regard to Unit VI. In the event of a fire in Unit VI, evacuation of the inmates housed there would be extremely difficult. First, the two outside doors would have to be unlocked.[3] Then each cell must be unlocked individually. There have been no walk-through fire drills with the inmates in Unit VI and consequently the risk of injury and death to the inmates in the event of a fire is substantial. In the event of a serious fire, the gate from the small exercise yard to the large exercise yard presumably would also have to be unlocked to find safety for the inmates. In order to alert the guards to a fire, the inmates must shout through the doors, and there have been situations when it was extremely difficult to get the attention of a correctional officer. Several fires have occurred in Unit VI.

### H. *Access to the Courts*

All of the inmates on death row have attorneys. Furthermore, they may request books from the prison's library and may request meetings with an inmate law clerk.

### I. *Contact with the Outside World*

Inmates in Unit VI may meet with their attorneys at reasonable hours without restriction in the visitation rooms. In addition, personal visitation is permitted in the visitation rooms. Inmates are limited to two visitors per week for one or two hours for each visit depending on the distance that the visitor must travel. There are often lengthy waits of two to three hours for visitors. There are two telephones available to the inmates daily for a total of

two hours per walk. Those telephones can be used to make collect calls only. In addition, a pay telephone is available in the big exercise yard, which the inmates may visit for approximately one hour every four days.

### J. *Officer Training*

The correctional officers assigned to Unit VI have received training at either the Tennessee Corrections Institute or the Tennessee Corrections Academy. They have no special training for working on death row.

## II. DEATH ROW AND THE HISTORY OF THE EIGHTH AMENDMENT

The conditions for inmates housed on death row must receive the special attention of the courts, both because of the history of the Eighth Amendment and because of the effects on human beings of the unique punishment to which these inmates have been sentenced. It is appropriate to examine the history of the Eighth Amendment in an attempt to resolve issues pertaining to treatment of those sentenced to death.

The courts have historically held that the Eighth Amendment was adopted to prevent inhuman, barbarous, or tortuous punishments. *See, e.g., Hemans v. United States,* 163 F.2d 228, 237 (6th Cir.), *cert. denied,* 332 U.S. 801, 68 S.Ct. 100, 92 L.Ed. 380 (1947). *See also Weems v. United States,* 217 U.S. 349, 370–71, 30 S.Ct. 544, 550–51, 54 L.Ed. 793 (1910). The Eighth Amendment to the Constitution is the exact language of the English Bill of Rights of 1689. A. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 Calif.L.Rev. 839, 840 (1969) (hereinafter cited as "A. Granucci"). It was also contained in the Bill of Rights of Virginia, and it was contained in many constitutions that were adopted by the original states in 1776. *Id.* The language was

---

**3.** The Court notes that in its tour of Unit VI, it took a considerable period of time to unlock the    doors for each walk.

not contained in the original Constitution or in the Articles of Confederation.

During the debate over the ratification of the Constitution, one of the serious objections was that there was no Bill of Rights. Objections from delegates from Massachusetts, and vigorous objections from George Mason and Patrick Henry in the Virginia delegation, raised serious concerns not only about the absence of a Bill of Rights, but also about the lack of a prohibition against inhuman treatment. *Id.* at 840–41. Their fear was that cruel and inhuman treatment would be permitted absent the language of the Eighth Amendment.

The record of the First Congress does not afford much insight in regard to the Eighth Amendment.[4] In order to understand what the founding fathers and the legislators at the First Congress intended when they adopted the prohibition against cruel and unusual punishment, it is necessary to examine the English history of punishment.

Because under the Normans fines rather than corporal punishment were imposed, the Magna Carta's reference to the concept of excessive punishment apparently involved only fines.[5] By the time of Edward I, however, corporal punishment had become a basic punishment. 2 F. Pollock and F. Maitland, *The History of English Law* 530–31 (2d ed. 1923). Misdemeanors were punishable by whipping, by mutilation, by removal of a hand or an ear, and grand larceny, being a felony, was punishable by decapitation. *Id.* at 495–96.

Treason carried a particularly harsh punishment. Pollock and Maitland, in their history of the law of England prior to Edward I, mention the unfortunate Duke of Wales who was drawn[6] for treason, hanged for homicide, cut down while still alive, disemboweled for sacrilege, and then beheaded for conspiring to kill the king. *Id.* at 501 and n. 1. As late as 1782 in the case of David Tyree, the Court pronounced sentence as follows:

Mr. Justice *Heath.*

You, David Tyrie, are to be led from hence to the gaol [sic] from whence you came; and from thence you are to be drawn, upon a hurdle, to the place of execution; and there you are to be hanged by the neck; and being alive, to be cut down, and your privy members to be cut off, and your bowels to be taken out of your belly, and there burnt, you being alive: and your head to be cut off, and your body to be divided into four

---

4. The entire discussion of the Eighth Amendment at the First Congress is as follows:

    [T]he committee ... then proceeded to the sixth clause of the fourth proposition, in these words, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

    Mr. Smith, of South Carolina, objected to the words "nor cruel and unusual punishments;" the import of them being too indefinite.

    Mr. Livermore.—The clause seems to express a great deal of humanity, on which account I have no objection to it; but as it seems to have no meaning in it, I do not think it necessary. What is meant by the terms excessive bail? Who are to be the judges? What is understood by excessive fines? It lies with the court to determine. No cruel and unusual punishment is to be inflicted; it is sometimes necessary to hang a man, villains often deserve whipping, and perhaps having their ears cut off; but are we in future to be prevented from inflicting these punishments because they are cruel? If a more lenient mode of correcting vice and deterring others from the commission of it could be invented, it would be very prudent in the Legislature to adopt it; but until we have some security that this will be done, we ought not to be restrained from making necessary laws by any declaration of this kind.

    The question was put on the clause, and it was agreed to by a considerable majority. 1 Annals of Cong. 754 (1789).

5. The language referred to in the Magna Carta is as follows:

    A free-man shall not be amerced for a small fault, but after the manner of the fault; (1) and for a great fault after the greatness thereof, saving to him his contenement; (2) and a Merchant likewise, saving to him his Merchandise; (3) and any other's villian than ours shall be likewise amerced, saving his wainage, if he fall into our mercy. (4) And none of the said amerciaments shall be assessed, but by the oath of honest and lawful men of the vicinage. [Amercement was essentially fining].

    Am.Jur.2d *Desk Book* 787 (1979).

6. The term "drawn" meant dragging.

quarters; and that your head and quarters to be disposed of where his majesty shall think fit.

21 T. Howell, *A Complete Collection of State Trials* 844 (1814). In reaction to these harsh and barbarous acts, the English Bill of Rights, which was adopted in 1689, specifically evinces the English disapproval of cruel and unusual punishment.[7]

▆ It is evident that the prohibitions in the Eighth Amendment evolved primarily from the concern for the manner in which individuals would be put to death. Although Tennessee has determined that the punishment for aggravated murder should be execution, those who have been condemned are entitled to a dignified death within the bounds of the Eighth Amendment. *See Groseclose,* 594 F.Supp. at 962; *Autry v. McKaskle,* 727 F.2d 358, 363 (5th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 1458, 79 L.Ed.2d 906 (1984). The Supreme Court has stated that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man," *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958), a purpose which illegitimates punishments that result in the destruction, denial, or degradation of the humanity of a criminal. *See McCray v. Burrell,* 516 F.2d 357, 367 (4th Cir.1975), *cert. dismissed,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976); *Gray v. Creamer,* 376 F.Supp. 675, 679 (W.D.Pa.1974). The history of the Eighth Amendment makes it clear that the prohibition against cruel and unusual punishment has, as a principal focus, the denial of unreasonable treatment of the individual prior to execution.

## III. CONCLUSIONS OF LAW

In *Grubbs v. Bradley,* 552 F.Supp. 1052 (M.D.Tenn.1982), the Court included Tennessee State Penitentiary where Unit VI is located in its finding that the conditions of confinement in Tennessee's Adult Prison System violated constitutional standards. *Id.* at 1070–72. Two years later this action was brought challenging the conditions in Unit VI alone. This Court will not relitigate the issues raised in *Grubbs,* but it will examine the impact of the changes in the conditions and policies of Unit VI since the findings of fact in *Grubbs* in 1982 for the following reasons. First, many of the conditions raised in this action were not addressed by the Court in *Grubbs. See Groseclose,* 594 F.Supp. at 958–59 n. 5. Second, when the Court made its findings in *Grubbs,* there were only nineteen inmates sentenced to death in Unit VI; there are now approximately forty-four persons sentenced to death and confined in that unit. Thus, the Court will examine the conditions in Unit VI to the extent that this increase in inmate population has significantly altered the conditions in Unit VI.

Third, when Warden Michael Dutton became warden at the Tennessee State Penitentiary, he made significant policy changes that greatly increased the restrictions on the inmates confined to Unit VI. These changes included elimination of com-

---

**7.** The preamble to the Bill of Rights makes reference to cruel and inhuman treatment inflicted by James II. There is some question as to what the drafters of that language were referring. *See* A. Granucci, 852–60.

Some say that the reference was to the trial of Titus Coates who had concocted a false story of a papist plot to assassinate Charles II, and as a result of what was referred to as his perjury, a number of innocent people were prosecuted and put to death. Coates was tried for perjury, convicted, and sentenced to life imprisonment. He was to be defrocked and to be flogged and pillaried four times a year. His appeal went to the House of Lords, and the conviction was upheld. It then went to the House of Commons, the lower house of the Parliament, and it was held that his sentence constituted excessive punishment. In addition, the Commons held that defrocking was a punishment that was beyond the authority of the temporal court. *Id.* at 856–60.

Others say that that language—referring to James II—refers to what is known as the Bloody Assizes. Judge Jeffries, after Lord Montmouth's unsuccessful rebellion, faced with the prosecution of hundreds and hundreds of people, and in a rather remarkable act of plea bargaining, told those accused that if they pled guilty they would not be put to death; but if they went to trial and were found guilty, they would be disemboweled and have their heads removed. There were over 500 guilty pleas as a result of this plea bargain, and those who went to trial were apparently tortured and put to death. *Id.* at 852–56.

missary visits, religious services, group dinners, and visits to the gymnasium. The effect of these changes was clearly to make Unit VI a separate "prison within a prison." Therefore, the Court will also examine the conditions in Unit VI to the extent that these changes have significantly altered the conditions in Unit VI since the Court's findings in *Grubbs*. Finally, as a practical matter, the Court must examine the conditions on death row because of this Court's finding that the conditions in Unit VI had caused Mr. Harries to waive his legal rights involuntarily and had contributed to his mental illness. *Id.* at 961. Mr. Harries' personal claim was not at issue in *Grubbs*. Thus, the Court's conclusions of law as to the constitutionality of conditions in Unit VI will be limited to changes in conditions and changes in policies that significantly affect the conditions on death row since the findings of fact in *Grubbs*.

■ Traditionally, federal courts have been reluctant to interfere with the administration of state prisons. *See Procunier v. Martinez*, 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). However, increasing pressure for prison reform has resulted in broad based judicial intervention in challenges to the constitutionality of entire prison systems. *See, e.g., Cody v. Hillard*, 599 F.Supp. 1025 (D.S.D. 1984); *Dawson v. Kendrick*, 527 F.Supp. 1252 (S.D.W.Va.1981); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976), *aff'd sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir.1977), *rev'd in part*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Federal courts no longer limit the prohibition against cruel and unusual punishment to specific acts directed at specific individuals; rather, it is applicable to the general conditions of confinement prevailing in state prisons. *E.g., Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir.1977); *Gates v. Collier*, 501 F.2d 1291 (5th Cir.1974); *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex.1980); *Palmigiano v. Garrahy*, 443 F.Supp. 956

(D.R.I.1977), *aff'd*, 616 F.2d 598 (1 Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980).

In cases challenging overall prison conditions and practices, courts often apply a totality of conditions analysis. *See Inmates of Allegheny County Jail v. Wecht*, 565 F.Supp. 1278, 1295 (W.D.Penn.1983); *Dawson v. Kendrick*, 527 F.Supp. at 1285. Properly applied, this approach requires examination of each element of the challenged prison conditions, recognizing the impact of its interdependent existence. *Id.* This analysis was employed by the Supreme Court in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), in affirming a remedial order of the lower court:

> The court was entitled to consider the severity of ... [past constitutional] violations in assessing the constitutionality of conditions in the isolation cells. The court took note of the inmates' diet, the continued overcrowding, the rampant violence, the vandalized cells, and the "lack of professionalism and good judgment on the part of the maximum security personnel." The length of time each inmate spent in isolation was simply one consideration among many. We find no error in the Court's conclusion that, taken as a whole, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment.

437 U.S. at 687, 98 S.Ct. at 2571 (citation omitted).

Totality of conditions analysis is in contrast to what has been described as "discrete adjudication." *See* Comment, *Complex Enforcement: Unconstitutional Prison Conditions*, 94 Harv.L.Rev. 626, 628 (1981).

> In discrete adjudication, the explicit target of the lawsuit is a particular incident or practice. Within the prison context, examples of discrete adjudication can be found in recent Supreme Court cases reviewing constitutional challenges to particular aspects of prisons. At issue may be the validity of a parole procedure, or

of rules restricting specific inmate activity such as a ban on soliciting for a prisoners' union. The Court's analytical approach in these cases exemplifies the essential character of discrete adjudication.

*Id.* (footnotes omitted). *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), is illustrative of the discrete adjudication approach. In *Bell,* one of the issues was whether a regulation prohibiting an inmate's receipt of hardback books not mailed directly from the publisher was in violation of the First Amendment. *Id.* at 550–52, 99 S.Ct. at 1880–81. The Supreme Court found the regulation constitutional because the prohibition was a rational response to a security problem, it was executed in a neutral manner, and alternative means of obtaining reading material were available. *Id.* Similarly, in *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), the Court held that neither the First Amendment nor the Equal Protection Clause were violated when prison officials prohibited a prisoners' union from soliciting other inmate members, barred union meetings, and refused to permit distribution of union publications. 433 U.S. at 131–36, 97 S.Ct. at 2540–43. "The primary constitutional concern in the discrete adjudication of isolated issues is the determination of the rationality of a given practice or policy in relation to a fundamental constitutional right." *Dawson,* 527 F.Supp. at 1285 (footnote omitted).

▪ The semantical line between prison conditions and prison practices cannot always be clearly drawn. Totality of conditions analysis is applicable to consideration of the physical conditions of confinement, whereas discrete adjudication necessarily assumes that a challenged practice is not of an interdependent nature and, therefore, may be isolated for purposes of constitutional analysis. *Id.* at 1285 n. 26. This distinction is particularly significant to the case at bar. Although petitioners' allegations and proof merit application of the totality of conditions approach, many of the challenged conditions and practices, such as inmate access to the courts, require consideration on a discrete adjudicatory basis in keeping with Supreme Court precedent. *Id.* at 1285. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Although conditions of confinement are unquestionably a proper subject for Eighth Amendment scrutiny, *Hutto,* 437 U.S. at 685, 98 S.Ct. at 2570, the Supreme Court has failed to articulate a specific method for examining these conditions. As a result, lower federal courts have struggled to define the totality of conditions approach. *See, e.g., Watson v. Ray,* 90 F.R.D. 143 (S.D.Iowa 1981); *Lightfoot v. Walker,* 486 F.Supp. 504 (S.D.Ill.1980). The courts have sought a judicial tool that would permit intervention without unnecessarily expanding the scope of the Eighth Amendment. *See* Comment, *Challenging Cruel and Unusual Conditions of Prison Confinement: Refining the Totality of Conditions Approach,* 26 How.L.J. 227, 230 (1983) (hereinafter cited as Comment, *Refining the Totality Approach* ).

In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court considered for the first time the limitation that the Eighth Amendment imposes upon the conditions in which a state may confine those convicted of crimes. *Id.* at 344–45, 101 S.Ct. at 2398. The response of the *Rhodes* Court to the need for conformity among the circuits was to offer the following guidelines to be applied in conditions cases.

No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101 [78 S.Ct. 590, 2 L.Ed.2d 630] (1958) (plurality opinion). The Court has held, however, that "Eighth Amendment judgments should neither be nor appear to be merely the subjective views" of judges. *Rummel v. Estelle,* 445 U.S.

263, 275 [100 S.Ct. 1133, 1139, 63 L.Ed.2d 382] (1980). To be sure, "the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability" of a given punishment. *Coker v. Georgia*, 433 U.S. 584, 597 [97 S.Ct. 2861, 2868, 53 L.Ed.2d 982] (1977) (plurality opinion); *Gregg v. Georgia*, 428 U.S. 153, 182 [96 S.Ct. 2909, 2929, 49 L.Ed.2d 859] (1976) (joint opinion). But such "'judgment[s] should be informed by objective factors to the maximum possible extent.'" *Rummel v. Estelle*, 445 U.S. at 274–75 [100 S.Ct. at 1139–40] (quoting *Coker v. Georgia*, 433 U.S. at 592 [97 S.Ct. at 2866] ).

*Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399 (short form citations modified to avoid ambiguity).

Although the Court avoided an explicit affirmation of the totality of conditions approach, the majority clearly indicated that a totality test should be applied. "[C]onditions [,] . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399. In contrast to the majority opinion, Justice Brennan's concurrence relied heavily on previous lower federal court prison conditions cases in outlining the application of the totality approach. *Id.* at 353 n. 1, 101 S.Ct. at 2402 n. 1 (Brennan, J., concurring). The concurrence states that prison conditions violate the Eighth Amendment when "'the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates....'" *Id.* at 364, 101 S.Ct. at 2408 (quoting *Laaman v. Helgemoe*, 437 F.Supp. 269, 323 (D.N.H.1977). *See also Ramos v. Lamm*, 639 F.2d 559, 566 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Since *Rhodes*, lower courts have consistently cited the majority opinion as support for a totality of conditions approach. *See, e.g., Ruiz v. Estelle*, 650 F.2d 555, 568 (5th Cir.1981), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Jones v. Diamond*, 636 F.2d 1364, 1368 (5th Cir.

1981), *cert. dismissed sub nom. Ledbetter v. Jones*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); *Grubbs v. Bradley*, 552 F.Supp. 1052, 1121 (M.D.Tenn.1982).

■ This Court is aware of the abundance of cases advocating deference to prison administrators in 42 U.S.C. § 1983 cases. *See, e.g., Bell v. Wolfish*, 441 U.S. at 547–48, 99 S.Ct. at 1878–79 (1979) (prison administrators should be accorded deference in the adoption and execution of policies that in their judgment are needed to preserve internal order, discipline, and security); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977) (the complex and difficult realities of running a penal institution require wide ranging deference to be accorded decisions of prison administrators); *Brown v. Johnson*, 743 F.2d 408, 410 (6th Cir.1984) (courts should ordinarily defer to the expert judgment of prison officials in the daily operation of a correctional facility) *cert. denied sub nom. Inosencio v. Johnson*, —— U.S. ——, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). Furthermore, the Supreme Court has reaffirmed the proposition that "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), *quoting Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). *See also Kendrick v. Bland*, 740 F.2d 432, 437–38 (6th Cir.1984). Federal courts must therefore avoid usurping the function of the state legislative and executive branches and encroaching upon the role of state prison officials. Comment, *Refining the Totality Approach*, at 236. General concerns with federalism, however, will not prevent this Court from ameliorating cruel and unusual prison conditions if found to be warranted pursuant to the totality of conditions approach. "Courts certainly have a responsibility to scrutinize claims of cruel and unusual confinement.... When conditions of confinement

amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional rights.' " *Rhodes v. Chapman,* 452 U.S. at 352, 101 S.Ct. at 2402 (quoting *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974)).

■ As noted above, no precise definition exists that identifies the point at which prison conditions violate the Eighth Amendment. In a totality analysis, a court will examine certain conditions that "do not rise to constitutional dignity but which aggravate the more serious defects and deficiencies." *Holt v. Sarver,* 309 F.Supp. 362, 380 (E.D.Ark.1970), *aff'd,* 442 F.2d 304 (8th Cir.1971). If the aggregate conditions transgress constitutional standards, the court is then empowered to fashion an appropriate remedy. Although elements of this remedy, if considered alone, may extend beyond constitutional mandates, they may be invoked as part of a comprehensive plan to eradicate the Eighth Amendment violation. *See Newman v. Alabama,* 559 F.2d 283, 288 (5th Cir.1977), *rev'd in part,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). *See also* Comment, *Refining the Totality Approach,* at 240.

In *Smith v. Coughlin,* 748 F.2d 783, 788 (2d Cir.1984), Lemuel Smith, a prisoner in a special unit for condemned persons in New York, challenged the restrictions imposed on him as a result of his confinement. *Id.* at 784. The prisoner was confined to a sixty square foot cell containing adequate lighting and ventilation. He had access to a radio and television twenty-four hours a day and the personal or legal materials of his choice. He was permitted to exercise daily from 8:30 a.m. until 3:30 p.m. in a yard measuring approximately twenty yards square and could receive visitors daily. Daily contact visits were permitted with either his attorney, a nurse, or a doctor, and weekly contact visits with a priest. He was allowed noncontact visits with a prison psychiatrist, members of his family, and four additional clergy. He was not allowed visits with lay religious advisors, friends, the press, employees of his attorney, or others, except by order of the court. In addition, he could not attend congregate religious services. *Id.* at 785.

Smith brought an action in federal district court pursuant to 42 U.S.C. § 1983 alleging violations of his First, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. In moving for injunctive relief, he contended that his confinement to the special unit and the associated restrictions on his behavior (1) deprived him of a liberty interest without due process of law, (2) subjected him to cruel and unusual punishment, (3) denied him equal protection of the laws, (4) denied him freedom of speech and religion, and (5) deprived him of access to the courts. *Id.* at 786. Smith sought contact visits with his mother, friends, and paralegals, interaction with fellow inmates, the right to attend congregate religious services, and the right to keep legal papers in his cell. He also testified that as a result of the totality of the conditions in the condemned persons unit, he had suffered psychological damage. *Id.* This physical and mental deterioration, he asserted, would result in his loss of will to fight his conviction through appeal and thereby violate his Sixth Amendment right of access to the courts. *Smith v. Coughlin,* 577 F.Supp. 1055, 1059 (S.D.N.Y.1983), *aff'd,* 748 F.2d 783 (2d Cir.1984).

The district court, citing *Rhodes v. Chapman,* found that the totality of the conditions of Smith's confinement did not constitute cruel and unusual punishment. 577 F.Supp. at 1060–61. Although the court found that the ban on visits by paralegal personnel violated his Sixth Amendment right of access to the courts, no other constitutional violations were found. *Id.* at 1063. Regarding Smith's claim that the adverse conditions of incarceration prior to execution would weaken his will and force him to surrender his right of appeal, the court found "no evidentiary basis that he is in imminent danger of voluntarily surrendering his right of access to the Courts." *Id.* at 1062. His treating psychiatrist cor-

roborated this finding, stating that although Smith suffered from anxiety, he was not suffering from a major disorder and his desire to reverse his conviction had not diminished. *Id.* at 1062–63.

The conditions of the death row in *Coughlin* and the conditions in the case at bar are vastly different. Smith's cell was sixty feet square. Many cells in Unit VI are barely half that size. The adequacy of the lighting and ventilation was not in dispute. Testimony heard in the case at bar revealed serious inadequacies in ventilation, heating, cooling, and lighting. Smith had access to an exercise yard seven hours per day. Inmates confined in Unit VI are permitted one hour per day in a completely caged-in yard. In short, vast modifications of the policies and practices at Unit VI would have to occur before it would ascend to resemble the conditions of which inmate Smith complained. As an aside, the Court would note that the lack of an evidentiary basis for Smith's claimed psychological debilitation was founded upon testimony of Smith's psychiatrist of two years. The attention to a death row inmate's psychological needs is conspiciously absent in the case at bar.

The tradition of deference to the decisions of prison administrators has survived the development of the totality of conditions approach. *See Cody v. Hillard*, 599 F.Supp. at 1046. Courts often invoke broad equitable powers in remedying constitutional deprivations, *e.g., Newman v. Alabama*, 683 F.2d 1312, 1320 (11th Cir. 1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983); *Battle v. Anderson*, 457 F.Supp. 719, 734–35 (E.D.Okla. 1978), and have been reluctant to impose comprehensive and intrusive remedies. *See Lock v. Jenkins*, 464 F.Supp. 541, 548–49 (N.D.Ind.1978), *aff'd in part, rev'd in part*, 641 F.2d 488 (7th Cir.1981) (federal courts should defer to prison officials as to the means by which unconstitutional conditions are corrected).

■ Because unconstitutional prison conditions infect the entire system of corrections, a comprehensive remedial scheme is the only method to insure continued compliance. Comment, *Refining the Totality Approach,* at 247. Although "[e]ach factor separately ... may not rise to constitutional dimensions [,] ... the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment...." *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974). *See also Alberti v. Heard*, 600 F.Supp. 443, 457–58 (S.D.Tex.1984). A constitutional right is not being established for each aspect of the remedy. *See Miller v. Carson*, 563 F.2d 741, 751 (5th Cir.1977) (when the totality of conditions violates the Constitution, remedies are not limited to the redress of specific constitutional rights). Rather, "[e]ven if no single condition of confinement would be unconstitutional in itself, 'exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment.'" *Rhodes v. Chapman*, 452 U.S. at 363, 101 S.Ct. at 2407 (Brennan, J., concurring) (quoting *Laaman v. Helgemoe*, 437 F.Supp. 269, 322–23 (D.N.H.1977)). *See also Cody v. Hillard*, 599 F.Supp. at 1047–48; *Hendrix v. Faulkner*, 525 F.Supp. 435, 525 (N.D.Ind.1981), *aff'd in part, vacated in part sub nom. Wellman v. Faulkner*, 715 F.2d 269 (7th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984).

## IV. CONCLUSIONS

The evidence presented in this action convinces the Court that individuals sentenced to death have unique psychological and emotional problems. Dr. Halleck testified not only that death row inmates generally experience serious psychological problems because of their sentence of death but that these problems are exacerbated if adequate counseling is not present, if inmates must remain idle for long periods of time, if heating and lighting are inadequate, and if the inmates are not properly classified so as to plan for their psychological needs properly. Transcript, at 33–42, 46. Mr. Gordon Chris Kamka, former Superintendant of the Maryland Reception Diagnostic

and Classification Center, Warden of the Baltimore Jail, and Secretary of the Maryland Department of Public Safety and Correctional Services, testified that when inmates are subjected to long periods of isolation without access to religious services or programs to reduce the idleness and to eating in their cells next to their toilets, it is likely that they would lose hope, with the implication that, as Mr. Harries, they may choose not to pursue their legal rights.[8] Transcript, at 290. Virtually all the witnesses testified that they feared that because of the anxieties and frustrations unique to death sentenced inmates, many of these individuals would be prone to outbreaks of violence. As a result, the Court concludes that those sentenced to death in Unit VI face unique psychological crises that inmates in the general population do not face. Consequently, the factors that go to a determination of whether the totality of conditions on death row constitutes cruel and unusual punishment should receive significantly different weights than the factors that are examined in a nondeath row conditions case.[9]

■ Upon consideration of the changes that have occurred since 1982, it is the judgment of the Court that the totality of conditions in Unit VI violates the Eighth Amendment's prohibition against cruel and unusual punishment. The principal concern of the Court is that the inmates remain idle and confined in their small cells for so much time. The cells are entirely too small to confine individuals for more than twenty-two hours a day, day after day. The temperatures in the cells vary excessively. Lighting in the cells is inadequate; many toilets are outmoded; and many cells are infested with insects.

Furthermore, there are conditions in the unit that seriously jeopardize the safety of the inmates. Inmates housed in Unit VI have a right to be protected against unreasonable threat of serious injury or death by assaults or fire. *See Dawson v. Kendrick,* 527 F.Supp. at 1289–90. The lack of a central locking system, the absence of fire drills, and the unsupervised freedom of the rockmen constitute serious safety problems, which the defendants must address.

The evidence before the Court further indicates that defendants largely ignore the emotional well-being of the inmates. Inmate interaction with other human beings is insufficient; there are no educational or work programs available; the inmates are not permitted access to a dining room or a gymnasium; they may not leave their cells to visit the commissary or law library; and exercise opportunities are minimal. Counseling services, although somewhat improved, are inadequate for so many men facing the death sentence. Of significant concern to the Court is that the inmates have no opportunity for congregate religious services.

The Court finds no constitutional problems with the inmates' rights of access to the courts. In addition, the Penitentiary's visitation policies are seemingly adequate. These practices will not be elements of the finding of unconstitutionality pursuant to the totality of conditions analysis.

It appears to the Court that a classification system incorporating psychological and personality evaluations could serve to alleviate the unconstitutional totality of conditions existing in Unit VI. Although the Fifth Circuit has cautioned that "[f]ederal courts are extremely reluctant to limit the freedom of prison officials to classify prisoners as they, in their broad discretion,

---

**8.** The Supreme Court has recently addressed the issue of the importance of a psychiatrist to the protection of legal rights. *See Ake v. Oklahoma,* —— U.S. ——, 105 S.Ct. 1087, 1096–97, 84 L.Ed.2d 53 (1985).

**9.** The Court finds the testimony of the defendants' expert James Henderson to be of minimal value in this case. Mr. Henderson is clearly an expert in prison administration, but on cross-ex-

amination, Mr. Henderson revealed no expertise as to death rows. In fact, the strongest thrust of Mr. Henderson's testimony was his evaluation of what was the proper administration of those inmates confined to Unit VI. For the reasons discussed in this Memorandum, the Court must avoid making administrative decisions relative to the operations of a prison.

may deem appropriate, ..." *Newman v. Alabama,* 559 F.2d at 287, such a classification system may provide a method for prison administrators to insure the constitutional rights of inmates.

The Constitution does not expressly require states to develop prisoner classification plans for the incarceration of convicted criminals. In the past, we have approved district court orders that require *state prisons* to develop classification systems, but those orders were not predicated on an Eighth Amendment right to classification. They were used as remedies employed to eradicate abuses that were themselves unconstitutional. For example, when prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners, and the level of violence becomes so high as to constitute cruel and unusual punishment under the Eighth Amendment, federal courts have broad authority to eradicate such conditions and may order the development of a classification system as part of the remedy.

*Jones v. Diamond,* 594 F.2d at 1015 (emphasis in original).

In deference to the expertise and discretion of the prison administration, this Court does not intend to direct defendants to implement a system of classification of inmates confined in Unit VI. However, in that the totality of conditions existing within Unit VI is unconstitutional, substantial remedial measures are in order. Classification would seem to be a logical, economical, and effective means of achieving this constitutionally mandated end.

The average death row inmate spends six to ten years pursuing appeals. Death sentenced inmates are aware that their institutional record while on death row could influence their chances for clemency; but, perhaps more significantly, the presence of a classification system could have the effect of improving the mental and physical health of the inmates. Specifically, inmates could be classified to identify death row inmates with serious emotional problems. Classification could reveal those inmates who could be allowed to participate in many out of cell activities such as group religious services, educational programs, work programs, group dining, indoor recreation, or fire drills. Classification could identify those inmates who could serve more safely as rockmen. Proper classification could also permit many inmates to be out of their cells long enough to allow the fumes from insecticides or paint to dissipate or to permit the installation of new toilets. Classification of inmates on death row need not involve the same procedures as with the general population. The inmates in Unit VI who receive a certain classification need not receive the freedoms given to inmates similarly classified in the general population. The Court found the testimony of witnesses Dutton, Rose, Pellegrin, and Henderson convincing that there were valid security concerns supporting the policy that those confined to Unit VI should be segregated from the remainder of the prison population. *See Bell v. Wolfish,* 441 U.S. at 546–47, 99 S.Ct. at 1877–78. Nothing in this Memorandum should be interpreted as requiring that the inmates sentenced to death in Unit VI should be integrated into the general population.

Under questioning by this Court, Warden Dutton acknowledged that with proper structural changes and other accomodations for security concerns, including more staff, the following changes in Unit VI could be accomplished for inmates classified "medium security" within a separate Unit VI classification system: (1) the visitation rooms could be used for weekly meals for four inmates at a time; (2) the day room ("law library") could be used more often; and (3) a group religious ceremony could be held, perhaps on Monday nights. It is the opinion of this Court that Warden Dutton's testimony is indicative of the potential curative effect of classifying the death row population. Dutton preferred to refer to such proposed changes as "program needs." Transcript, at 726–27. The onus of correcting the unconstitutional conditions existing at Unit VI is on the defend-

ants. Regardless of the approach or its label, each condition contributing to the unconstitutional totality must be addressed.

A special master, to be appointed by the Court, will work in conjunction with the defendants to prepare a comprehensive plan to abate the unconstitutional conditions prevailing at Unit VI. This plan will encompass the physical characteristics of the Unit and the cells, the policies and practices of the defendants, and the physical and psychological needs of the inmates, all contributing to the totality of conditions currently existing. The Court reserves the right to add to, delete from, or modify the proposed plan in such a fashion as to effectuate the constitutionality of the totality of conditions of the Unit. An appropriate ORDER shall enter.

### ORDER

In accordance with the Memorandum filed contemporaneously herewith, it is hereby DECLARED that the totality of the conditions existing at Unit VI of the Tennessee State Penitentiary amount to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The parties shall, within thirty (30) days of the issuance of this ORDER, submit to the Court the name of an individual to serve as special master pursuant to FED.R.CIV.P. 53. In the event the parties are unable to agree on a person to serve as special master, each party shall submit two (2) recommendations of individuals who have not been witnesses in this case to the Court by that date, and the Court will determine who shall serve. Within ninety (90) days of the appointment of the special master, defendants will submit a good faith plan to the Court to remedy the unconstitutional totality of conditions found within Unit VI.

The special master is to work in conjunction with the defendants in formulating the proposed plan. Objections to the plan will be filed within ten (10) days of its filing. The Court reserves the right to modify the plan should it fail to remedy the unconsti-

tutional totality of conditions, and the Court shall retain jurisdiction of this cause pending complete implementation of an adequate remedy.